CHARLES H. DRESSER ET ALS. *vs.* THE HARTFORD LIFE
INSURANCE COMPANY ET ALS.

Third Judicial District, Bridgeport, April Term, 1908.
BALDWIN, C. J., HAMERSLEY, HALL, PRENTICE and THAYER, Js.

In an action brought by certain certificate-holders against an in-
surance company, its officers and directors, and a trust company,
the complaint alleged that the defendant, a joint-stock insurance
company, in 1880, adopted a plan of assessment insurance pub-
lished and known as the "safety fund plan," by which plan the
insured paid an admission fee, the sum of $3 for each $1,000 of
insurance for expenses, an assessment on the death of any other
certificate-holder, and $10 on each $1,000 of his insurance to
make up a safety fund to be deposited with the defendant trust
company as trustee; said fund was to be invested in United States
bonds, registered in its name as trustee; the earnings of the fund
after it reached $300,000, and all contributions thereto after it
reached $1,000,000 in the par value of such bonds, were to be
divided among the remaining certificate-holders in proportion
to the face amount of their certificates; in case of failure of the
insured to pay assessments as made, his interest in said fund was
to be forfeited for the benefit of the remaining certificate-holders;
when the face amount of the outstanding certificates became
less than $1,000,000, it was to be divided among the outstanding
certificate-holders proportionately; such fund was to belong ab-
solutely to the certificate-holders, and the company was to have
no interest therein except in its application for the benefit of the
certificate-holders, in accordance with said plan; that the com-
pany publicly announced that it would do business in accord-
ance with the terms of the said plan as above stated; these state-
ments were made in numerous writings, circulars and by parol
by its officers, managers and agents to the public, all certificate-
holders, and to all persons contemplating becoming certificate-
holders, as an inducement to take said certificates and make
payments thereunder, and were continued until the abandon-
ment of said plan in 1899; that, in order to enable the company
to defraud and impose upon the certificate-holders, the terms of
the certificates were purposely made so involved that it is diffi-
cult for the ordinary person to understand the true meaning
thereof; that the company represented to the public and to the
certificate-holders, as an inducement to join and to make pay-
ments, that the certificates were in accordance with the said
"safety fund" plan, and, particularly, that they did provide in
substance that when the outstanding insurance was reduced to

$1,000,000, the principal should. be divided among the outstanding certificate-holders, and that the fund belonged wholly to the certificate-holders; that the plaintiffs relied upon such representations and were induced thereby to accept their certificates and to make the payments, and have complied with all conditions, and said certificates were still in force; said certificate provided for the creation of a mortuary fund by the payment of mortality calls, said calls to be determined according to a table therein given of graduated mortality ratios, and further provided that, if at any time the company "shall fail by reason of insufficient membership or shall neglect" to pay the indemnity provided for, it should be the duty of the trustee to divide the fund among the then certificate-holders proportionately; that in 1899 the company, without the consent of the certificate-holders, ceased to transact business under the safety fund plan, for the fraudulent purpose of depriving the certificate-holders of the benefit of said plan and of the advantages accruing from new membership, and also to increase the payments of the remaining certificate-holders, and hasten the time when it might claim possession of the safety fund and to divert to its own benefit the payments levied for expenses; that for the same purposes said company fraudulently offered various inducements to certificate-holders to induce them to surrender their certificates; that the company diverted from the moneys of the said safety fund department large sums and collected a large amount for expenses over and above the amount necessary to pay the expenses of conducting the said safety fund department, and used the same in the conduct of its other business and had levied unnecessary assessments; that the trustee, with the consent and procurement of the company, changed the investment of said fund from United States bonds to other bonds and securities resulting in loss to the said fund, and had failed to divide the increment of the fund over $1,000,000 par value in United States bonds; that while in 1897 said insurance amounted to $100,000,000 it had fallen to $40,000,000; that said company claimed that said safety fund did not belong to the policy-holders, and asserted the right to demand dues and assessments after the amount of outstanding insurance should be decreased to $1,000,000, thereby inducing certificate-holders to allow their certificates to lapse. On demurrer to the complaint it was *held:*—

1. That the complaint was not multifarious. The company and its directors are alleged to have jointly participated in the alleged misappropriation and mismanagement; and the Security Company, the custodian of the fund, was properly made a party (General Statutes, § 618) as one having an interest in the controversy or necessary to be made a party for a complete determination or settlement of the question in controversy.

2. That the circulars, letters and other explanations, issued by the company both prior and subsequent to the issuance of the plaintiffs' policies were admissible in connection with proof that the plaintiffs relied upon them as showing the interpretation which the parties themselves placed upon the contract of insurance; and as tending to prove the alleged actual or constructive fraud.

3. That it would be at least constructive fraud for the company under an interpretation by it of the language of the certificate in direct variance with the representations of its circulars, to use the moneys of the "safety fund" department to the injury of the plaintiffs.

4. That it was unnecessary to allege that the plaintiffs did not understand the terms of the certificates, or that they were misled by them, since it is alleged that the certificates were accepted in reliance upon the representations of the company made in the circulars.

5. That the company, being authorized by its charter to issue insurance on other than the safety fund plan, could, in the absence of a promise by the company to the certificate-holders that it would not issue policies on any other plan, or that it would continue to issue safety fund certificates, cease to issue safety fund certificates and issue insurance on another plan; and that improper motives in so doing did not render the company or its directors liable to the plaintiffs.

6. That since it is alleged that the defendants had appropriated to their own use money to an amount stated, which by the terms of the contract they had no right to do, it is unnecessary to expressly characterize the acts as wrongful.

7. That the $3 "expense dues" provided for in the certificate, did not become part of the funds of the "safety fund" department, but belonged to the insurance company to be used for its own benefit and that of its stockholders without accountability to the certificate-holders.

8. That the acts of the defendants in making claims as to the construction and effect of the contract did not in themselves constitute a cause of action. As a part of the description, in connection with other allegations of the complaint, of the alleged misappropriation and threatened misappropriation of the moneys of the "safety fund" department, such allegations are properly a part of the complaint.

9. That while the remoteness of the danger of injury to the plaintiffs from the intended acts of the defendants may properly be considered by a trial court in deciding whether equitable relief ought to be granted, it does not appear, in view of the fact that since 1897 the insurance in force under the "safety fund" plan has diminished from $100,000,000 to $40,000,000, that such danger is necessarily so remote as to forbid the interference of a court

of equity. Equity may grant relief against a threatened injury where a plaintiff's rights may be prejudiced by delay.

10. That the certificate-holders had such an interest in the safety fund deposited with the trustee as would justify the trial court in granting relief against the trustee to save them from loss from any unlawful change which the trustee, with the consent and procurement of the insurance company, may have made in the securities in which the fund was invested.

11. That the company could not increase the amount of the mortality calls above the amounts stated in the application for insurance made a part of the certificate.

12. That the certificate was susceptible of the construction that the holders of such certificates were entitled to a distribution of the entire safety fund when the aggregate amount of outstanding certificates should be reduced to $1,000,000.

13. That since the contract was susceptible of such a construction it should not be reformed.

14. That where the construction of an insurance policy is doubtful, that construction most favorable to the insured should be adopted.

15. That by §§ 3489, 3490, 3491 and 3546 of the General Statutes, exclusive authority is given to the insurance commissioner to apply for the appointment of a receiver of an insurance company which is claimed to be doing business in an illegal or improper manner; and the appointment of a receiver cannot be made on the application of certificate-holders except as such relief may be incidental to such an accounting as may be ordered.

16. That upon proof of the allegations that the company had diverted large sums from the "safety fund" department, had collected excessive assessments, had changed the investment from United States bonds to other securities, had failed to divide the excess over $1,000,000 of the safety fund and used the sums so gained for the benefit of its stockholders and directors, the trial court might order an accounting for moneys unlawfully collected or received by it.

17. That a court of equity will not lend its aid to cause or to enforce a forfeiture of moneys lawfully received by an insurance company from certificate-holders, when other adequate relief for the alleged injuries can be granted, and when there has been no rescission of the contract of insurance and no offer or apparent intention by either party to rescind it.

18. That the allegations that the company and its directors purposely made the terms of the certificates involved in order to defraud intending certificate-holders, diverted large sums from the :"safety fund," collected excessive assessments, failed to divide the excess of the safety fund as provided and used the sums so granted for the benefit of its stockholders and directors, were sufficient to justify the trial court in adjudging the company and its officers liable in money damages.

Dresser v. Hartford Life Ins. Co.

Legal and equitable relief may properly be demanded in the same
    action (General Statutes, § 613).

Argued April 14th—decided June 9th, 1908.

SUIT to obtain an adjudication of the rights of the plaintiffs and of all other certificate members of the defendant insurance company, in and to a fund of $1,000,000 or more held for their protection and benefit by the defendant security company, and for other equitable relief; brought to the Superior Court in New Haven County and tried to the court, *Robinson, J.*, upon a demurrer to the complaint; the court sustained the demurrer and rendered judgment for the defendants, from which the plaintiffs appealed. *Error and cause remanded.*

The plaintiffs are thirty-one holders of certificates of insurance issued by the defendant insurance company on or about the 1st of December, 1890. The defendants are the Hartford Life Insurance Company, its president, secretary, and its directors, who are said to constitute a majority of its stockholders, and the Security Company of Hartford.

The first seven paragraphs of the complaint allege that the defendant insurance company was originally chartered in 1866, with a capital stock of $200,000, under the name of The Hartford Accident Insurance Company; that its charter has since been amended by different Acts of the legislature; that with a capital stock of $500,000 it now transacts insurance business under various plans, including level premium life insurance, for the benefit of its stockholders, and that prior to 1880 it had invented a plan of assessment life insurance which was published and known as the "safety fund plan," the principal features of which as set forth in paragraph 8 of the complaint, are the following:—

8. Each person applying for insurance under the plan was to pay an admission fee of from $8 to $40; to pay annually, for the sole purpose of paying the expense of said insurance on said safety fund plan, $3 for each $1,000 of insurance; to pay as mortuary payments or assessments to meet death losses an amount graduated according to the

policy-holder's age when the assessment was made, the amount of his policy, and the total amount of insurance or indemnity in force with the company ; to pay $10 on each $1,000 of his insurance to make up a "safety fund." This "safety fund" was to be deposited with the defendant, the Security Company of Hartford, Conn., as trustee. As often as the fund composing such sum amounted to a sufficient sum to purchase $1,000 par value of United States bonds, such trustee was to make investments of such funds therein and register the same in its name as trustee of the "safety fund" of said insurance company. The earnings of this "safety fund" after it reached $300,000, and all contributions to said fund after it reached $1,000,000 in United States bonds par value, were to be divided among the remaining certificate-holders in proportion to the face amount of their certificates. In case of failure of any certificate-holder to make payments in accordance with his agreement, his interest in said safety fund and all his claims were to be forfeited for the benefit of the remaining certificate-holders ; and, when the face amount of outstanding certificates was less than $1,000,000, it should be divided among the outstanding certificate-holders in proportion to the face amount of their certificates. Said fund was to belong absolutely to the certificate-holders, and the company was to have no interest whatsoever therein, except in its application for the benefit of the certificate-holders in accordance with the terms of said plan.

Other material allegations in the several paragraphs of the complaint are as follows : 9. Some time in the year 1880 the defendant insurance company adopted said plan, and publicly announced that it would do business on said plan and in accordance with the terms thereof as hereinbefore stated, and particularly announced to the public and all certificate-holders that said "safety fund" was to belong absolutely to the policy-holders ; that the company had no interest in it except in its application for the benefit of the certificate-holders in accordance with the terms of the "safety fund" plan as above outlined, and that when

the insurance outstanding was reduced to $1,000,000 the principal of said fund would be divided among the remaining certificate-holders. Said announcements continued down to about March, 1899. These statements were made in numerous writings and by parol by the officers, managers, and agents of said company to the public, and to all certificate-holders, and to all persons contemplating becoming certificate-holders as an inducement to take said certificates and make payments thereunder, and particularly said company did in the year 1880 cause to be so published and issued in large numbers a circular of which Exhibit A, hereto annexed, is a copy. Said company continued to so issue such and other similar circulars and make such statements as an inducement to persons to become certificate-holders and to make payments under the terms of said certificates down to about March 19th, 1899.

Exhibit A, referred to in paragraph 9, contains, among other statements, the following: " Herewith will be found circulars which unfold to you a system of protection that is destined to become immensely popular, and will supersede the forms of insurance heretofore worked, combining, as it does, the cheapness of co-operative societies with a strength and soundness unknown in life insurance. . . . Under the Safety Fund System of Protection, . . . by the investing of $10.00 on each one thousand dollars of your insurance in U. S. Bonds, registered for yourselves as members, forming a Safety Fund limited to one million dollars, held by your own trustee, you not only make the insurance as secure as are National Bank Bills, but in five years your insurance becomes self-sustaining, for by examination you will see that the BASIS of our Graduated Assessment Table is 1000 ONE THOUSAND DOLLAR CERTIFICATES, THAT ·IS, ONE MILLION DOLLARS INSURANCE, and with this number and amount insured, assessments would be sufficient to pay all losses or claims in full, and as the membership increases above 1000 certificates in force, the assessment rate decreases, or there would be produced more than enough to pay the loss assessed for.

But should the membership in after years fall to less than 1000 Certificates in force, that is, to a point where an assessment fails to produce enough to pay a loss in full, then the Safety Fund would be at once divided to the THEN members, paying to them the FULL FACE of these certificates while living."

" 10. The terms of said certificates were purposely made so involved that it is difficult, if not impossible, for the ordinary person to understand the true meaning and import thereof, in order to enable said company to defraud and impose upon the public and certificate-holders, and only a person learned in the technicalities of insurance and law can fully understand the same." (A copy of said circular is attached to said paragraph.)

" 11. The company thereupon represented to the public and to certificate-holders and to all persons contemplating becoming certificate-holders, as an inducement to become such certificate-holders and to make payments in accordance thereof, that said certificates were in accordance with said ' safety fund ' plan in all respects as above stated, and particularly that they did provide in substance that when said outstanding insurance was reduced to $1,000,000, the principal of the fund should be divided among the outstanding certificate-holders, and that said ' safety fund ' belonged wholly to the policy-holders, and that the company had no interest therein except in its application for the purposes described in said ' safety fund ' plan as above set forth, and that such was the true meaning and construction of said certificates. And in particular did, and in the year 1885 or 1886, issue and distribute in large numbers, for the purpose of inducing persons to accept certificates and make payment thereunder, a certain circular entitled ' The Safety Fund System Explained,' in which was used the following language : ' The Safety Fund System Explained.' ' The rates given in the table of assessment ratios are such that while there is $1,000,000 or more of insurance in force the assessments will pay all claims in full. Should the amount of insurance in force

fall below $1,000,000, the division of the safety fund to the then members will pay them the full face of their certificates at once and while living.' . . . "

12. The plaintiffs on or about the first day of December, 1890, relied upon said representations and were induced thereby to accept their certificates (a copy of one of which, marked Exhibit B, is attached to said paragraph), and to make the payments called for thereunder, and have made all the payments called for and complied with all the conditions of said certificates, and said certificates are still in force.

Exhibit B consists of the application for insurance, the certificate issued, with copy of agreement between the insurance company and the Security Company, and the table of graduated mortality ratios for every $1,000 of death loss on each $1,000 of a total indemnity in force of $1,000,000.

The following are among the provisions of the certificates :—

" POLICY.          AMOUNT.

SAFETY FUND DEPARTMENT.     $1000.

" IN CONSIDERATION of the representations, agreements, and warranties made in the application herefor, and of the Admission Fee paid ; and of the sum of TEN DOLLARS, on each $1,000 of the Indemnity herein provided for, to be paid to said Company, as herein required, to create a Safety Fund as hereinafter described, and of Three Dollars per annum on each $1,000, for expense Dues, to be paid as hereinafter conditioned, and of the further payment of all Mortality Calls proportioned to the Indemnity herein provided for, levied against the herein named member to form a Mortuary Fund for the payment of all Indemnity matured by deaths of members, which mortality calls, to be levied upon all the members in the department wherein this Certificate is issued whose Certificates are in force at the dates of such deaths, shall be made according to the table of graduated mortality ratios given hereon, and as further determined by their respective ages and the aggre-

gate Indemnity at the dates of such deaths, with due allowance for discontinuance of membership, does hereby issue this Certificate of Membership in its Safety Fund Department to Charles H. Dresser (herein called the member) of Hartford, County of Hartford, State of Connecticut with the following agreements :

" That ninety days from the receipt by the President or Secretary of said Company of satisfactory proofs, . . . upon presentation and surrender of this Certificate properly receipted, there shall be due and payable, out of the aforesaid Mortuary Fund and not otherwise, the Indemnity of One Thousand Dollars. . . .

" That said Company will deposit said sum of Ten Dollars, when received, with the Trustee, named in a contract made with it (of which a copy is printed hereon), as a Safety Fund in trust for the uses and purposes expressed in said contract; and shall make a semi-annual division of the net interest received therefrom by it, *pro rata* among all the holders of Certificates in force in said Department at such times, who shall have contributed five years prior to the date of any such division their stipulated proportion of said Fund, by applying the same to the payment of their future dues and assessments ; and that, whenever said Fund shall amount to One Million Dollars, all subsequent receipts therefor shall be divided by the said Company in like manner as the interest.  Said Company further agrees that if at any time it shall fail by reason of insufficient membership, or, shall neglect, if justly and legally due, to pay the maximum indemnity provided for by the terms of any Certificate issued in said Department, and such Certificate shall be presented for payment to said Trustee by the legal holder thereof, accompanied by satisfactory evidence, as hereinafter provided, of its failure to pay, after demand upon it within the time herein stipulated for limitation of action, then it shall be the duty of said Trustee to at once convert said Safety Fund into money and divide the same (less the reasonable charges and expenses for the management and control of said Fund) among the holders of Certificates

then in force in said Department, or their legal representatives, in the proportion which the amount of each of their Certificates shall bear to the amount of the whole number of such Certificates in force ; . . .

" And said Company further agrees that so long as any Certificate of membership in its Safety Fund Department shall remain in force, said Fund shall be in no wise chargeable or liable for any use or purpose except as above mentioned.

" And said Company further agrees that the aforesaid Mortuary Fund shall be in no wise chargeable or liable for any use or purposes other than for the settlement of Death Claims, except as herein mentioned. . . ."

The agreement between the insurance company and the Security Company, after reciting the provisions of the certificate, contains, among others, the following provisions :—

" Now, THEREFORE, the party of the first part (the defendant insurance company), . . . does hereby appoint the party of the second part Trustee as aforesaid and covenants and agrees with it and its successors in said trust to deposit with said Trustee, as soon as received, the sum of ten dollars on each thousand dollars of the amount of each and every Certificate of membership issued by it in the aforesaid department until said Fund shall amount to one million dollars, to be by said Trustee held in trust and accumulated as hereinafter agreed, and the income thereof, less the reasonable compensation and expenses of said trust, to-be paid over to the party of the first part, as hereinafter provided, to be used by the party of the first part in accordance with the hereinbefore recited agreements : And when said Trustee shall pay the income, as above, to the party of the first part, or, shall make any other payments from said Fund, as required by the terms hereof, the liability of said Trustee on the amount so paid shall cease ; it being understood and agreed that said Fund belongs to the party of the first part, subject to the expressed trusts herein provided.

. " AND the party of the second part (the defendant Security Company), for itself and its successors, in consideration of such deposits and of a reasonable compensation for its services and the necessary expenses of managing said trust, covenants and agrees with the party of the first part and its successors and with each of the holders of the aforesaid Certificates that it will receive, hold, manage and dispose of all said deposits made with it by said Insurance Company, principal and income, in accordance with the uses and purposes specified in the hereinbefore recited agreements of the party of the first part with its Certificate holders ; . . .

" That, as often as the sum composing such Fund shall be in amount sufficient to purchase one thousand dollars, par value, of United States Bonds, said Trustee shall make investments of such funds therein and register the same in its name as Trustee of the Safety Fund of the said Insurance Company, and, provided no default by the party of the first part as hereinbefore recited shall occur, shall accumulate said fund and the income thereof (less the reasonable compensation and expenses), for five years from July 1st, 1879, or until such time thereafter as said Fund shall amount to three hundred thousand dollars, par value, of the bonds, purchased for said Fund, when the party of the second part will pay over to the party of the first part, semi-annually thereafter, all the further income from said Fund (less the accruing and unpaid compensation and expenses), to be by the party of the first part used for the purposes mentioned in the hereinbefore recited agreements : And, unless such default shall occur, will thereafter add to the principal of said Fund the deposits thereafter received from the party of the first part, exclusive of the income therefrom, until the whole Fund shall amount in such bonds, at their par value, to one million dollars : And in the event of the failure or neglect mentioned in the hereinbefore recited agreements, will convert said Fund into money and divide the same in accordance with the hereinbefore recited agreements, as soon as can reasonably

be done after the necessary information of the proper persons and their shares shall have been obtained: . . .

"It is hereby mutually understood and agreed by both parties hereto that all the hereinbefore recited agreements of the party of the first part with its Certificate-holders shall constitute the uses and purposes of the trust expressed herein.

"And it is hereby further understood and agreed that at such time as it shall be shown that all Certificates of membership issued by the party of the first part in its Safety Fund Department, have been legally settled and surrendered to it, or properly canceled in accordance with their terms, it shall be held and considered that the uses and purposes of said trust have been fully accomplished by said Insurance Company, and the balance of said Fund, if any, shall be paid over to the party of the first part. . . ."

13. Said company continued to transact business and to issue substantially similar certificates under the same representations and for the same purpose down to about March, 1899, issuing many thousands of such certificates, which were accepted on the faith of such representations, so that at the end of the year 1897 there were outstanding 49,434 certificates insuring an amount aggregating $100,731,600, and said " safety fund " had then accumulated to over $1,000,000 in value in the hands of said trust company, and said trust company still holds said fund, which is now largely in excess of $1,000,000 in value, to wit, more than $1,500,000.

"14. Said plan was extremely popular and the number of certificate-holders was then rapidly increasing.

"15. On or about March, 1899, said company, without notice to the outstanding certificate-holders, without their consent, and against their will, ceased to issue policies and to transact business under said 'safety fund plan' and abandoned said plan.

"16. Said company did this for the fraudulent purpose of depriving the outstanding certificate-holders of the benefit of said plan and of the advantages accruing from new

membership and new contributions to the safety fund, and also of enabling said company, by reducing the number of those liable to contributions for mortuary payments, to increase the payments of the remaining certificate-holders and hasten the time when it might claim the possession of said safety fund for its own benefit and that of its managers and stockholders in the manner set forth in paragraph 30, and also in order that it might divert the payments levied for expenses to its own and their benefit and emolument instead of using them in accordance with the contract for payment of expenses.

" 17. In pursuance of the purposes and intents described in paragraph 16, and for the further fraudulent purpose of diverting the business of said 'safety fund' department to its own benefit and to the special benefit of the other defendants, other than said trust company, and to the benefit of the stock department, the defendant, the Hartford Life Insurance Company, fraudulently offered various inducements to induce the holders of certificates in said 'safety fund' department to surrender their certificates and take out in place thereof policies in the stock department of said company and to discontinue all payments for expenses or for death assessments to the 'safety fund' department, and has thereby induced large numbers of the certificate-holders to abandon their relation with the 'safety fund' department and take out policies in the stock department of said company to the injury of the remaining certificate-holders.

"18. In order to accomplish these ends said insurance company caused such inducements to be offered in whole or in great part through the same agents employed by it in connection with the 'safety fund' department, and offered special pecuniary inducements to such agents to accomplish such results.

" 19. The defendant insurance company has diverted from the moneys and property of said 'safety fund' department large sums of money, to wit: over —— million dollars to the use and benefit of itself and the managers

and stockholders of the stock department, and particularly so diverted in the year 1897 the sum of $68,000, and in the year 1896, $88,468.07. The plaintiff cannot state the full amount of such fund so diverted because the defendant, the Hartford Life Insurance Company, has possession of all the books, papers and information on such subjects.

"20. In particular, after said March, 1899, down to the present date defendant insurance company has received and collected a large amount for expenses, to wit: over one million dollars, which it wholly diverted to its own use and benefit and to the use and benefit of its stockholders, agents and managers and that of the stock department, with the exception of a comparatively small sum not exceeding $20,000 annually, and not exceeding $120,000 in all, paid and used for expenses of sending out and collecting assessments, receiving proofs and making payment; and has also since said date diverted large sums from the 'safety fund' payments and from other funds belonging to said 'safety fund' department, the amount of which plaintiffs cannot state because the books and papers of the company are exclusively in possession of defendant.

"21. Defendant insurance company has also collected from the certificate-holders without any warrant therefor in the contract and without right, the sum of ten cents for sending out each notice of mortuary assessment, amounting to many thousands of dollars, and has also collected without right excess payments over the sum of three dollars per thousand for expenses to a very large amount, and payments largely in excess of ten dollars per thousand for payments to said 'safety fund' without law or right; which amounts cannot be stated by the plaintiffs because the defendants have exclusive possession of all the books and papers of said company.

"22. The said Security Company, with the consent and procurement of the defendant insurance company, at some time after said 'safety fund' reached the sum of $1,000,000 in United States bonds par value, without right and without knowledge or consent of the certificate-holders, changed

said fund from its investment in United States bonds to an investment in other bonds and securities, the nature of which is to the plaintiffs unknown.

" 23. As a result of said diversion, losses resulted to said fund amounting to more than $100,000, the exact amount of which plaintiffs cannot state because the said insurance company has possession of all the books, papers and information on that subject.

" 24. Said defendant insurance company has failed to divide the increment of said fund over $1,000,000 par value in United States bonds among the certificate-holders in accordance with the conditions of the policy, although the fund with its increment amounted to more than $1,000,000 par value in United States bonds.

" 25. The outstanding certificate-holders of the company are now reduced in number, as nearly as can be ascertained, to about 20,000, with aggregate insurance amounting to about $40,000,000.

" 26. Defendants are not managing and administering the funds of said ' safety fund ' department economically, but, on the contrary, are improperly and illegally expending unnecessary amounts in connection therewith, to the great loss of the certificate-holders.

" 27. Said defendant insurance company, for the purpose of compelling the certificate-holders to abandon their certificates and insurance on account of inability to pay mortuary assessments, are and have been levying assessments excessive and unnecessary in amount and number, and are thereby accumulating a large amount of money for their own fraudulent uses which is unnecessary for the payment of death losses, and now have in their hands as the result of such assessment the sum of over $325,000, the exact amount of which cannot be stated because said company has possession of all the books, papers and information on that subject.

" 28. Said company, acting through the individual defendants as directors and officers, is still continuing to attempt to coerce and induce certificate-holders to aban-

don the safety fund department for the purposes above stated, and is still continuing to divert moneys from said department for its own use and for the benefit of the stock department and of the managers and directors.

"29. After said 'safety fund' reached the sum of $1,000,000, and after March, 1899, when the said defendant insurance company ceased to do business on said 'safety fund' plan and ceased to admit new members thereto, it made the claim, and still continues to do so, that said safety fund does not belong to the policy-holders, but belongs to said insurance company, and asserts the right and intention to continue to make demands for mortuary dues and assessments without limit as to number or amount, and also claims the right to levy and demand such dues and assessments, and the charges for expenses described in this complaint after the amount of outstanding insurance is reduced below $1,000,000, and on the non-payment thereof to declare the rights of the certificate-holders in said fund forfeited and appropriate the fund to its own benefit; and in case said assessments are paid to pay off all said policies and then appropriate the fund to its own benefit. Defendant insurance company claims that it can levy assessments and demands as above described after the outstanding insurance is reduced to $1,000,000 under said policy, and that the true meaning and effect of said policy is such that it can so levy such assessment for mortuary dues without limit as to amount or number, and it expresses the intention to do so, and said directors and officers acting officially as such on behalf of said company still continue to make the same claims.

"30. The assertion of the claims above stated in paragraphs 28 and 29 is injurious to the interests of such 'safety fund' certificate-holders, because it induces certificate-holders to refuse to pay assessments and allow their certificates to lapse, thereby causing heavy demands to be made for such mortuary dues upon the remaining certificate-holders.

"31. Defendant George E. Keeney became president, and

said Bacall and the other defendants, besides said corporations, directors of said Hartford Life Insurance Company at some time on or before the year 1899. At exactly what time plaintiffs are unable to state. They took their positions with knowledge of the facts hereinbefore stated, and have accepted the benefits of said fraudulent transactions, and are continuing to divert the money received therefrom to their own benefit and that of the stock department.

" 32. The moneys fraudulently converted, as above stated, to the benefit of the stock department have been largely used for the benefit of said defendant officers and directors in the payment of dividends to stockholders and in the increase of stock, the construction of large buildings for the benefit of the stock department, and other purposes for the benefit of said stock department and of the defendants, officers and directors.

" 33. The various fraudulent and wrongful acts and concealments described in the 10th, 15th, 16th, 17th, 18th, 19th, 20th, 21st, 22d, 23d, 24th, 26th, 27th and 32d paragraphs of the complaint have been concealed and withheld from the plaintiffs and other certificate-holders generally, and have not been ascertained by them until a period within the last two years.

" 34. The defendant, the Hartford Life Insurance Company, and the Security Company, on the 31st day of December, A. D. 1879, duly executed and delivered the contract (a copy of which is annexed to Exhibit B and entitled Trustee's Contract), and said Security Company immediately thereafter entered upon the performance of its duties thereunder and has continued to receive from the said Hartford Life Insurance Company moneys under same, and received and held the moneys described in the 22d, 23d, 24th and 29th paragraphs under said contract."

The prayers for relief are as follows :—

" 1. That the true amount of said 'safety fund' be ascertained and declared and adjudicated to be the property of the 'safety fund' certificate-holders, and that the said Hartford Life Insurance Company has no property therein ;

that it be declared and adjudicated that it is the true meaning and intent of said certificates of membership that said 'safety fund' belongs absolutely to the certificate-holders, and that when the amount of the face value of outstanding certificates is reduced by death, lapse, or other causes to the amount of $1,000,000, said fund is to be distributed among said certificate-holders then outstanding in proportion to the face value of their certificates, or that said certificates be amended and reformed so as to convey said meaning.

"2. That said Hartford Life Insurance Company be enjoined from claiming that said 'safety fund' belongs to it, and from claiming the right to make any assessments for mortuary dues or expenses after the amount of outstanding certificates is reduced to an aggregate face value of one million dollars, and from making any such assessments.

"3. That said trust company be enjoined from turning over any portion of the principal of said fund to said insurance company except the surplus over $1,000,000.

"4. That said insurance company be enjoined from making any demands from the certificate-holders for expenses of said 'safety fund' department.

"5. That a receiver be appointed to take charge of said safety fund department of said insurance company and to collect and receive all moneys due for expenses, and to make all necessary calls or assessments for mortuary dues and make all payments in accordance with said 'safety fund' plan as hereinbefore stated.

"6. That defendant, the Hartford Life Insurance Company, and said officers, stockholders and directors, be ordered to account for all moneys received for expenses, and after deduction of the amount actually used for proper expenses connected with the management of said 'safety fund' department be ordered to pay over said moneys to said receiver for the benefit of said certificate-holders in the 'safety fund' department.

"7. That said insurance company be ordered to account for and pay over all moneys received from the holders of

certificates of the 'safety fund' department since March, 1899, when said insurance company ceased to transact business on said 'safety fund plan,' after deducting the amount actually paid out for legitimate expenses and mortuary claims.

"8. That it be declared and adjudged that said Hartford Life Insurance Company by its acts, heretofore described in this complaint, in abandoning transaction of business under the 'safety fund' plan without the consent and against the will of the certificate-holders, and in causing the 'safety fund' to be diverted from its investment in United States bonds and invested in other securities, and by its other acts, as hereinbefore described, has broken the contract with each and all holders of certificates in such 'safety fund' department and forfeited all moneys and benefits received from said certificate-holders.

"9. That it be ordered and adjudged that said insurance company and said defendants as officers and directors thereof account for and pay over to the said receiver all sums received from said certificate-holders and in connection with the said 'safety fund' department, except such portions thereof as have been expended in legitimate expenses of conducting said business and in the payment of losses in said department.

"10. That said insurance company and said officers and directors pay over to the receiver all sums found to be due on said accounting.

"11. That a general receiver be appointed to take charge and manage the business of said company.

"12. That a temporary receiver be appointed during the progress of this litigation and until the court has made further order in the premises.

"13. Damages in the amount of one million dollars against said defendants except said Security Company.

"14. Such other and further relief as in equity may pertain.

"15. That said Security Company be adjudged liable for the loss of said 'safety fund' described in paragraphs

22 and 23, and ordered to make up and restore said loss at its own expense."

. The court sustained the defendants' demurrers, and rendered judgment for the defendants.

*John K. Beach* and *Talcott H. Russell*, for the appellants (plaintiffs).

*Charles E. Perkins* and *Lewis Sperry*, for the appellees, the Hartford Life Insurance Company *et als.* (defendants).

*Charles E. Gross*, for the appellee, Security Company (defendant).

HALL, J.   This is an action brought by the plaintiffs as quasi-creditors and holders of certificates of mutual assessment insurance issued by the defendant Hartford Life Insurance Company under what is called its "safety fund system," instituted by the named plaintiffs for their own benefit, and for that of all other similarly situated certificate-holders, and asking for equitable relief on account of alleged misappropriations and threatened misappropriations by said insurance company and its officers of the moneys of the "safety fund," and of the safety fund department of insurance, which moneys, it is alleged, the plaintiffs and other certificate-holders either own or have an interest in, and asking for the enforcement of the obligations of the insurance contract regarding said funds.

The defendant Hartford Life Insurance Company demurred to the complaint and certain paragraphs thereof and prayers for relief upon twenty-one grounds, the ten individual defendants upon four grounds, and the defendant Security Company upon six grounds.   The rulings of the court sustaining all of these grounds of demurrer are the errors assigned.   Most of the questions presented by the appeal may be discussed in considering the rulings of the trial court upon the several grounds of demurrer of the Hartford Life Insurance Company.   The grounds of demurrer,

stated in substance, will be considered in their numerical order.

First, to the complaint, upon the ground that it is multifarious, since the nine individuals and the Security Company are joined with the insurance company as defendants, and there is no allegation of a joint liability of the insurance company to the plaintiffs with said other defendants or any of them, and no joint relief prayed for against the insurance company and the other defendants or any of them, excepting by the ninth and tenth prayers for relief. This ground of demurrer was erroneously sustained.

The plaintiffs have a common interest in the subject of this action and were properly joined.   General Statutes, § 617; *Lewisohn* v. *Stoddard*, 78 Conn. 575, 63 Atl. 621. The averments of paragraphs 19, 20, 24, 26, 27, 28, 31, 32 and 33 of the complaint are broad enough to permit proof of facts showing that the insurance company, and its officers made defendants, jointly participated in the alleged misappropriation of funds and mismanagement of the business of the " safety fund " department.   As the Security Company is the custodian of the fund the plaintiffs' and the insurance company's present interest in which and future ownership of which is in question, it was not improperly made a party under § 618 of the General Statutes, as one having an interest in the controversy or necessary to be made a party for a complete determination or settlement of the questions in controversy.   That the Security Company has such an interest is clearly shown by some of its reasons of demurrer.   The relief asked for against the Security Company itself is incidental to the main relief prayed for, and is properly asked for in this action. *Lewisohn* v. *Stoddard*, 78 Conn. 575, 604, 63 Atl. 621. A misjoinder of the Security Company, or any of the other defendants, with the insurance company would not have defeated the action as to all the parties, but in that case the parties improperly joined should have been dropped. General Statutes, § 622; *Fairfield* v. *Southport National Bank*, 77 Conn. 423, 427, 59 Atl. 513.

Second, to paragraphs 9, 11 and 12 of the complaint, upon the ground that all prior negotiations and representations between the parties were merged in the contract of insurance, and that parol or written representations are not admissible to change or affect the contract, in the absence of allegations of fraud, accident, or mistake. This ground of demurrer should have been overruled.

It is alleged in paragraphs 9, 11, 12 and 13 that the in surance company continued to make said representations and explanations after the plaintiffs' certificates were issued and until the company ceased to issue such policies in March, 1899. When the paragraphs demurred to are read in connection with paragraph 10 and subsequent paragraphs of the complaint it is clear that fraud is charged. It would be at least a constructive fraud for the insurance company, under an interpretation by it of the language of the certificates in direct variance with the representations of these circulars, to use the moneys of the "safety fund" department to the injury of the plaintiffs. This is in effect charged in the complaint. *Palmer* v. *Hartford Fire Ins. Co.*, 54 Conn. 488, 9 Atl. 248; *Rorschneider* v. *Knickerbocker Life Ins. Co.*, 76 N. Y. 216. The alleged written statements of the company would be admissible in evidence as showing, in connection with proof that the plaintiffs relied upon them, the interpretation which the parties themselves placed upon the contract of insurance. They tend to prove that when the plaintiffs received these certificates, and paid from time to time the sums required to be paid by the certificates, both they and the insurance company understood the contract alike. *Home Life Ins. Co.* v. *Pierce*, 75 Ill. 426; *Bruce* v. *Continental Life Ins. Co.*, 58 Vt. 253, 2 Atl. 710; *Fuller* v. *Metropolitan Life Ins. Co.*, 70 Conn. 647, 671, 41 Atl. 4; *Bray* v. *Loomer*, 61 Conn. 456, 464, 23 Atl. 831; *Elting* v. *Sturtevant*, 41 Conn. 176, 182. They would also be admissible as tending to prove, in connection with proof that the plaintiffs relied upon them, the alleged actual or constructive fraud.

Third, to paragraph 10 of the complaint, upon the

ground that it contains no averment that plaintiffs did not understand the terms of the certificates, or that they were misled by them, and upon the ground that it appears upon the face of the certificates that their terms are not involved. This should have been overruled.

The language of the certificate justified the averment that its terms are, at least, not entirely clear. It was not necessary for the plaintiffs to allege that they were unable to understand the language of the certificates, or that they were misled by their terms, since they have in paragraph 12 averred that they accepted them relying upon the representations of the insurance company in Exhibit A and the other described circulars. The manifest purpose of paragraph 10 was to aver that one step in the alleged fraudulent purpose of the insurance company was to make the terms of the certificates so obscure that it might afterward successfully place upon them an interpretation variant from the language of the circulars, which it is alleged the company is now endeavoring to do.

Fourth, to paragraphs 15, 16, 17 and 18 of the complaint, upon the ground that the insurance company had the legal right to issue policies of insurance upon others than the " safety fund " plan, and to cease issuing certificates under the " safety fund " plan, without obtaining the consent of the certificate-holders. This ground of demurrer was properly sustained.

The insurance company was authorized by its charter to issue insurance on other than the " safety fund " plan. We find neither in the so-called circulars nor in the certificates any promise, either express or implied, by the insurance company to the certificate-holders, that it would not issue policies on any other than the " safety fund " plan, or that it would continue to issue safety-fund certificates any longer than it did. *Wright* v. *Minnesota Mut. Life Ins. Co.*, 193 U. S. 657, 24 Sup. Ct. Rep. 549; *Green* v. *Hartford Life Ins. Co.*, 139 N. Car. 309, 51 S. E. 887. Having a legal right to do the acts complained of in these four paragraphs, neither the insurance company nor its

officers are rendered liable even if their action was induced by improper motives as alleged. *Fisher, Brown & Co.* v. *Fielding*, 67 Conn. 91, 106, 34 Atl. 714.

Fifth, to paragraph 19 of the complaint, upon the ground that it is not averred that the alleged diversion was wrongfully made. This ground of demurrer should have been overruled.

A fair interpretation of the language of paragraph 19, read in connection with that of paragraph 8, is that the insurance company and its managers and stockholders had, during the years named, appropriated to their own use money to the amount stated, which, by the terms of the contract, they had no right to do. It was unnecessary to expressly characterize such acts as wrongful.

Sixth and seventh, to paragraph 20 of the complaint, upon the ground that it appears by the terms of the contract of insurance (Exhibit B) that the " three dollars per annum on each $1,000, for expense dues," belongs to the insurance company.

We are of opinion that by the terms of the certificates no part of the $3 " expense dues " became part of the funds of the " safety fund " department, but that it belonged to the insurance company, to be used for its own benefit and that of its stockholders without accountability to the certificate-holders. By the language of the contract, the promise by the certificate-holders was " to pay to said company, for expenses, dues of Three Dollars per annum on each $1,000 Indemnity . . . so long as this Certificate shall remain in force." This is an absolute promise to pay a fixed sum for a certain time, without reference to the amount of the actual expenses incurred by the company or to the continued solicitation of new business. The insurance company continues to manage the business of the " safety fund " department, although it has ceased to issue new certificates. *Security Co.* v. *Hartford*, 61 Conn. 89, 98, 23 Atl. 699. These ground of demurrer were properly sustained in so far as they apply to the alleged diversion, in paragraph 20, of the $3 expense dues, but, for the

reasons above stated regarding the fifth ground of demurrer, they were not rightly sustained in so far as they are directed to the allegation, in said paragraph, of a diversion of large sums from the "safety fund."

Eighth, to a part of paragraph 21 of the complaint. This need not be considered, as the plaintiff has withdrawn its claim under paragraph 21, that the collection by the company of ten cents for sending notices of mortuary assessments was unauthorized.

Ninth and tenth, to paragraphs 29 and 30 of the complaint, upon the ground that the alleged claims by the insurance company as to the construction of the contract (Exhibit B) do not constitute a cause of action against them in behalf of these plaintiffs.

The trial court rightly sustained the defendants' claim that these paragraphs did not describe acts which in themselves constituted a cause of action entitling the plaintiff to any relief asked for. While relief may possibly be granted on account of the acts done, or threatened to be done, by the insurance company to the plaintiffs' injury, under said claimed construction of the terms of the certificates, no facts are alleged entitling them to relief against the mere making of the alleged claim. As a part, however, of the description, in connection with other paragraphs of the complaint, of the alleged misappropriation and threatened misappropriation of the moneys of the "safety fund" department, paragraph 29 properly remains a part of the complaint.

Eleventh and twelfth, to the first prayer for relief, upon the grounds that the action is prematurely brought, since it appears that the plaintiffs have not suffered, and may never suffer, any injury on account of the alleged threatened acts of the insurance company regarding its title to the "safety fund," and its right to collect mortuary assessments after the outstanding insurance shall be reduced to $1,000,000, and upon the further ground that the plaintiffs cannot in this action obtain an amendment of their several certificates.

Equity may grant relief against a threatened injury where the plaintiffs' rights may be prejudiced by delay. The demurrer admits that the insurance company asserts the right and the intention to do the acts described in paragraph 29 of the complaint. How soon the amount of the outstanding certificates may be reduced to $1,000,000 we cannot say. It appears from the averments of paragraphs 12 and 25 that since 1897 the amount of such insurance in the defendant company has diminished some $60,000,000. The remoteness of the danger of injury to the plaintiffs from the intended acts of the defendants may properly be considered by the trial court in deciding whether equitable relief ought to be granted. It does not appear from the complaint that such danger is necessarily so remote as to forbid the interference of a court of equity. Whether, in fact, there is a sufficiently substantial injury to the plaintiffs' rights, or such reasonable ground for the apprehension of injury to them from the alleged acts and intended acts of the defendants as will justify equitable interference, may be a question for dispute upon a trial of the case. Should it appear that the plaintiffs' rights are or are likely to be seriously prejudiced by the alleged acts, or intended acts, of the defendants, under their interpretation of the contract of insurance, it would seem to be necessary for the court to place a construction upon the language of the certificate in order to determine whether such acts of the defendants could be justified. It seems to be unquestioned that, by the express terms of the contract, the certificate-holders, who for five years have contributed their stipulated proportion of the safety fund, have been and are entitled to have applied upon their future dues the net interest received from the fund, as well as the excess of the fund over $1,000,000.

The real question in dispute is not so much whether the certificate-holders or the insurance company are the present owners of the "safety fund," as whether, by the terms of the certificates, the holders are entitled to a distribution of the entire "safety fund" when the aggregate amount of out-

standing certificates shall be reduced to $1,000,000, as claimed by the plaintiffs, or whether the insurance company, when the amount of the certificates shall be so reduced, may continue to demand dues and assessments from the certificate-holders, and, upon nonpayment, appropriate the entire safety fund to itself, as it is alleged in paragraph 29 and stands admitted, it claims the right to do. The defendants, in support of their demurrer to this prayer for relief, contend that it appears upon the face of the contract of insurance, made a part of the complaint, that the plaintiffs' claimed construction of the certificate cannot be adopted. We cannot sustain this contention. We have already said that certain written statements issued by the company would be admissible to aid in ascertaining the true meaning of doubtful provisions of the certificates. But we are also of opinion that, even without the aid of such extraneous evidence, the language of the certificates does not prohibit the construction contended for by the plaintiffs as to the time when the "safety fund" must be divided. The language of the certificate is that "if at any time it [the insurance company] shall fail by reason of insufficient membership, or, shall neglect, if justly and legally due, to pay the maximum indemnity provided for by the terms of any Certificate, . . . it shall be the duty of said Trustee [the Security Company] to at once convert said Safety Fund into money and divide the same . . . among the holders of Certificates then in force. . . . The plaintiffs claim that by this provision there must be such a division of the safety fund among the certificate-holders when their number becomes so reduced that the aggregate amount of their insurance does not exceed $1,000,000, as would be the case when there were but one thousand holders of certificates of $1,000 each. The claim of the insurance company, as stated in paragraph 29 and admitted by the demurrer, is that, even after the number of certificate-holders are so reduced, it may continue to collect dues and to make mortuary assessments, unlimited in the average amount and unrestricted by the number of certificate-holders, and

to declare the rights of certificate-holders forfeited who fail. to pay such dues and assessments. If the insurance company may so continue to levy assessments unlimited in amount, it is difficult to see when there can be a failure to pay certificates by reason of insufficient membership, or how the certificate-holders have much protection from the existence of the so-called " safety fund." Which of these constructions is the correct one depends upon what is meant by the provision, if the insurance company shall " fail " (to pay the amount of any certificate) " by reason of insufficient membership." Clearly by the word " fail " is not meant a default in any obligation assumed by the insurance company. While the company undertakes to make the assessments (*Lawler* v. *Murphy*, 58 Conn. 294, 20 Atl. 457), and to pay the sum collected, its express agreement is to pay the amount of certificates from the " mortuary fund and not otherwise." If, after an assessment for the payment of the amount due upon a certificate is properly made and the assessment paid, the amount realized proves insufficient to pay the indemnity due, the failure is that of the mortuary fund and not of the insurance company, and there can be no such failure of the mortuary fund " by reason of insufficient membership," unless there is a fixed maximum limit of assessment. The certificate fixes such a limit. It provides that the payment of " mortality calls " to form a "Mortuary Fund " for the payment of " all Indemnity matured by the deaths of members " are to be levied " according to the table of graduated mortality ratios given hereon, and as further determined by their respective ages and the aggregate indemnity at the dates of such deaths." In the application, which is by its terms made a part of the contract of insurance, each member agrees to pay " all Mortality Calls determined as within set forth." Attached to Exhibit B is a table showing the method of determining mortality calls and the ratios graduated according to ages of certificate-holders for assessments against each holder of a $1,000 certificate, for the collection of a death loss of $1,000. This method is based upon a minimum outstand-

ing insurance of $1,000,000. There is no other method provided by the contract, and therefore none for the making of mortality calls after the total of amount of outstanding insurance falls below $1,000,000. It is expressly stated that these ratios will decrease as the total amount of outstanding insurance increases. There is no suggestion that they can ever be increased. It must be held that they cannot. Even if it is doubtful which of the two claimed constructions of the contract should be adopted, the doubt should be resolved in favor of the insured. *Liverpool, etc., Co.* v. *Kearney*, 180 U. S. 132, 21 Sup. Ct. Rep. 326; *Fricke* v. *United States Indemnity Society*, 78 Conn. 188, 192, 61 Atl. 431. The demurrer to the first prayer for relief, in so far as it applies to that part of the prayer which asks that the certificates be construed as providing that when the amount of the face of outstanding certificates is reduced to $1,000,000 the safety fund is to be distributed among the certificate-holders, should have been overruled. Since the contract may be construed as above stated, it should not be reformed as requested.

The thirteenth and fourteenth, to the second and fourth prayers for relief, were properly sustained. They have been sufficiently considered in the discussion of the sixth, seventh, ninth and tenth grounds of demurrer.

Fifteenth, nineteenth and twentieth, to the fifth, eleventh and twelfth prayers for relief, upon the grounds that the complaint alleges no sufficient grounds for the appointment of a receiver, and that by the laws of this State the right to apply for the appointment of such receiver is confined exclusively to the insurance commissioner.

Sections 3489, 3490, 3491 and 3546 of the General Statutes describe some of the powers of the insurance commissioner in matters touching the questions raised by these grounds of demurrer. He is to " see that all laws respecting insurance companies are faithfully executed." He may " examine into the methods of business of any company . . . doing any kind or form of insurance in this state, . . . and if in his opinion such company . . . is

doing business in an illegal or improper manner, he may order it to discontinue such illegal or improper method of doing business. . . ." "If any such company . . . shall fail . . . to obey any such order . . . he may apply to a court or judge having jurisdiction for an injunction, or for the appointment of a receiver, or for both, and such court or judge may enforce such order of the commissioner by injunction, or by appointing a receiver."

Under § 3546, if the insurance commissioner finds that the assets of an insurance company incorporated by the laws of this State are less than its liabilities, or if such company "shall fail to comply with any requirement of law, he may notify it to cease the issue of new policies or the payment of dividends to stockholders . . . until the deficiency be made good or the law complied with"; and he may, and if the assets of the company are less than three-fourths of its liabilities must, bring his petition to the Superior Court, or to a judge of the Supreme Court of Errors, praying for the appointment of a receiver, and that the charter of said company may be annulled; and said court or judge is empowered or directed to appoint such receiver, and to "annul the charter and decree the dissolution of such company, and to make all other orders and decrees necessary and proper in reference to winding up the affairs of such company and the disposition of its property."

Section 3351 of the General Statutes also provides for the appointment by the Superior Court of a receiver to wind up the business of any corporation organized under the laws of this State, upon the application of stockholders owning not less than one-tenth of its capital stock, for certain causes, including fraud or gross mismanagement in the conduct or control of such corporations. The acts of the insurance company complained of in this action are embraced in those described in § 3490, and for such acts the only statutory provision authorizing the appointment of a receiver by the Superior Court is upon proceeding instituted by the insurance commissioner. We may assume that the peculiar danger of serious injury to the credit and

business of such institutions of a public nature, as banks and insurance companies, from the institution of even groundless applications for the appointment of receivers, may have been one reason why the legislature deemed it proper to place the exclusive power of commencing such proceedings against them in the hands of an experienced and disinterested public officer. While the Superior Court would not, in an action like the present one, be bound by any construction placed by the insurance commissioner upon the terms of these certificates, and while, under its general equity jurisdiction, it would have the power to appoint a receiver *pendente lite* for the preservation of any property in question in a suit before it, or as incidental to an accounting ordered, we are of opinion that it was the intention of the legislature to intrust it solely to the judgment of the insurance commissioner, when an application for the appointment of a receiver should be made for the causes described in § 3490. *American Casualty Ins. Co.* v. *Fyler*, 60 Conn. 448, 462, 22 Atl. 494 ; *Ulmer* v. *Falmouth L. & B. Asso.*, 93 Me. 302, 45 Atl. 32 ; *Huntington County L. & S. Asso.* v. *Fulk*, 158 Ind. 113, 63 N. E. 123 ; *Broadwell* v. *Inter-Ocean H. & L. Asso.*, 161 Ill. 327, 43 N. E. 1067. The said fifth, eleventh, and twelfth prayers for relief were properly held to be insufficient, excepting as, in connection with the sixth and tenth prayers, they ask for the appointment of a receiver as incidental to such accounting as may be ordered.

Sixteenth, to the sixth prayer for relief, upon the ground that the moneys received for expenses belong to the insurance company and that it is not required to account for them. For the reasons stated in discussing the sixth and seventh grounds of demurrer, this ground was properly sustained, to the extent that it asks for an accounting for the $3 annual expense dues.

Seventeenth, to the seventh prayer for relief, upon the ground that the allegations of the complaint do not authorize the accounting and payment asked for. This ground of demurrer should have been overruled.

Paragraphs 19, 20, 21, 24, 26, 27 and 32 contain allegations sufficiently broad to permit the proof of facts upon which the Superior Court may, under the sixth, seventh, or tenth prayers for relief, or all of them, order an accounting by the insurance company for moneys unlawfully collected or received by it and its officers, not including the $3 annual expense dues.

Eighteenth, to the eighth and ninth prayers for relief, upon the grounds that the allegations of the complaint do not justify a declaration by the court that the moneys received by the insurance company from the certificate-holders have been forfeited; that courts of equity will not decree forfeitures; and that it is not alleged that the individual defendants have received said moneys. This ground of demurrer was properly sustained upon the first two reasons stated therein.

The Superior Court, as a court of equity, will not lend its aid to cause or to enforce a forfeiture of the moneys lawfully received by the insurance company from certificate-holders when, as in this case, it appears that other adequate relief for the alleged injuries can be granted (1 Pomeroy Equity Jurisp. (3d. Ed.) §§ 459, 460; *Warner* v. *Bennett*, 31 Conn. 468, 478); and when there has been no rescission of the contract of insurance, and no offer or apparent intention by either party to rescind it. We have already said that it is sufficiently alleged that the individual defendants participated in the alleged wrongful appropriations of funds.

Twenty-first, to the thirteenth prayer for relief, upon the ground that the averments of the complaint do neither justify the awarding of damages, nor show the grounds or amount of such damages, nor from whom they should be recovered. This ground of demurrer should have been overruled.

The averments of paragraphs 10, 20, 21, 24, 26, 27 and 32 are sufficient in form and substance to allow the proof of facts which would justify the Superior Court in adjudging the insurance company and its officers who

are defendants liable in money damages to the plaintiffs.

The four grounds of demurrer of each of the ten individual defendants upon the grounds, generally, that no facts are alleged showing a liability to the plaintiffs of such defendant, either individually or jointly with any of the other defendants, should have been overruled for the reasons above stated in considering the first ground of demurrer of the defendant insurance company.

The defendant Security Company demurs upon the following grounds: First, second, third and fourth, to the entire complaint, upon the grounds, in substance, that inasmuch as it is not alleged that the insurance company has failed to pay the maximum indemnity provided by the terms of any certificate, and the plaintiffs admit that the safety fund is not to be divided among the certificate-holders until the aggregate outstanding insurance is reduced to $1,000,000, and it appears from the averments of paragraph 25 of the complaint that the outstanding insurance amounts to about $40,000,000, the plaintiffs have no right or interest in the safety fund, and therefore no cause of action against this defendant either alone or jointly with the other defendants; and upon the further ground that there is a misjoinder of causes of action, and that the complaint is multifarious. These demurrers should have been overruled.

What we have already said regarding the character and purpose of this action, the joinder of parties, both plaintiffs and defendants, and the remedy for a misjoinder, the construction which the certificates of insurance will admit of, and the power of the court to grant some relief asked for should it conclude upon a hearing of the facts that the rights of the plaintiffs were likely to be prejudiced by the acts, or threatened acts, of the defendants,—makes further discussion of these four grounds of demurrer unnecessary.

Fifth, to the third prayer for relief, upon the grounds stated in its first, second and third demurrers to the complaint. This should have been overruled for the reasons just stated.

Sixth, to the fifteenth prayer for relief, upon the grounds stated in its second and third demurrers, which we have already considered, and upon the further grounds, in substance, that the plaintiffs are not creditors either of the Security Company or the insurance company, that the contract regarding the safety fund shows that it belongs to the insurance company, and that the insurance company has a legal remedy for the alleged breach of such contract by the Security Company.

The question of the right of the Security Company to change the investments from United States bonds to other securities is not raised by these grounds of demurrer, and they should have been overruled. The agreement of the Security Company is expressed to be with the insurance company and with each of the certificate-holders. Although the plaintiffs are not the present owners of the safety fund and may never become so, they have, as we have before stated, such an interest in it as, upon facts which may be proved under the averments of the complaint, would justify the Superior Court in granting some relief asked for, to save the certificate-holders from loss from any unlawful change which the Security Company, with the consent and procurement of the insurance company, may have made in the securities in which the "safety fund" was invested. Legal and equitable relief may properly be demanded in the same action. General Statutes, § 613.

That certain demurrers to particular paragraphs of the complaint and prayers for relief were properly sustained, as above stated, does not finally dispose of this case, since the remaining paragraphs before enumerated, and remaining prayers for relief, are sufficient to permit the proof of facts showing a good cause of action.

There is error, the judgment is set aside and the case remanded with direction to overrule certain of the demurrers as indicated in this opinion, and to proceed with the case according to law.

In this opinion the other judges concurred.