**RICHARDSON v. SMITH, Collector of
Internal Revenue.**

**No. 190.**

Circuit Court of Appeals, Second Circuit.
March 10, 1939.

White & Case, of New York City
(Charles E. Hughes, Jr., Joseph M. Hart-
field, Josiah Willard, and Holt S. McKin-
ney, all of New York City, of counsel), for
plaintiff.

James W. Morris, Asst. Atty. Gen., and
Sewall Key, J. Louis Monarch, and James
E. Murphy, Sp. Assts. to Atty. Gen., Rob-
ert P. Butler, U. S. Atty., and Louis Y.
Gaberman, Asst. U. S. Atty., both of Hart-
ford, Conn., for appellee.

Before L. HAND, AUGUSTUS N.
HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up on an appeal from
a judgment for the defendant in an action
for money had, brought by a taxpayer
against a collector of internal revenue. It
was tried by consent to a judge who made
findings of fact, and decided that the taxes
paid had in fact been due; that is the only
question before us, and in deciding it we
shall not go behind the findings. The
Commissioner of Internal Revenue includ-
ed within Richardson's income for the
year 1933 the income from five trusts, set
up by his wife on May 16, 1932, the res in
each being shares of the Piedmont Finan-
cial Company which he had earlier trans-
ferred to her. Unless these shares con-
tinued to be Richardson's after the trans-
fer, the tax was improperly assessed: it is
the position of the defendant that they
did so continue. The supposed invalidity
of the transfer resulted from the con-
tinued dominion of Richardson over the

shares, which is thought to have been evidenced, not only by his wife's obedience to his directions as to these particular shares, but by her general complaisance towards him in the case of several other transactions, nearby in time. It will be clearest to describe the challenged transfer first; and then the others which are invoked to throw light upon the implicit understanding of the spouses at the time when the first was made.

On July 6, 1931, Richardson, who with his brother and their wives owned all of the 100,000 shares of the Piedmont Financial Company, surrendered a certificate for 25,000 shares, standing in his name, and took back one of 19,000 in his wife's name and another of 6,000 in his own. He put both of these in his safe, and it may be assumed, though it does not definitely appear, that she did not then learn of the transfer: she had no separate safe of her own, or even a bank account, both spouses drawing upon a common account as need was. These shares remained undisturbed until May 15, 1932, when the wife transferred 15,300 of them back to Richardson, upon the five separate trusts whose income is the subject of this action: for the remaining 3,700 shares she took, and has kept, a certificate in her own name. The couple had five children, and one trust was set up for each child; though the number of shares differed, the limitations were the same in each trust. The trustee was empowered to use so much of the income as in his discretion he thought wise for the child's maintenance, until he came of age; thereafter until he was 35 the trustee was to pay him as much as—again in his discretion—he might "determine"; at 35 the child was to receive the accumulations, and thereafter the income for life, with remainders over not necessary to describe. The trustee was given a power to revoke the trust at pleasure and take over the res as his own. The commissioner did not hold that Richardson was the owner of the res by virtue of the power last mentioned, or for any other reason except that by the apparent transfer to his wife he had not parted with the shares. For this conclusion he relied, not only upon the fact that Richardson had received back 80% of them upon trusts which he might terminate; but also upon four other transactions which evinced, he thought, the same purpose, and, taken with the trusts and the wife's general impotence financially, proved the un-

reality of the transfer. The substance of these four transactions was as follows. (1) On December 23, 1930, Richardson gave his wife 9,000 shares of the Vick Financial Corporation, which she sold three days later to the Piedmont Company, at once turning over all the proceeds to him. (2) On June 23, 1931, he gave her 20,000 other shares of Vick stock which she sold on the next day to the Piedmont Company for $107,000, directing that $93,000 should be used to expunge a debt of Richardson to that company, and retaining the remainder of the credit as her own. (3) On May 27, 1932, Richardson transferred to her 53,000 more shares of Vick stock, 9,800 of which she sold on December 28, of that year, to the Piedmont Company for $49,000, which she deposited to his account. The remainder she still holds. (4) The Richardson family formed a pool to sell short 30,000 shares in a company called Drug, Inc. Between January 8th and March 16, 1931, they borrowed these shares from Richardson's wife, and on March 7, 1932, Richardson transferred his interest in the pool—one quarter of it—to his wife. On May 17, 1932, she in turn transferred to him 9,000 of the 30,000 shares owed her by the pool, and upon liquidation in December 1932, these shares were delivered to him in pursuance of this transfer.

The judge took the view of the commissioner; he found that because of the facts we have recited Richardson's transfer to his wife of 19,000 shares of Piedmont stock on July 6, 1931, was not a gift. His precise finding was that "the transfer * * * was not a sale nor was it a gift made with donative intent"; and his meaning he further explained in his "comment" upon the first conclusion of law. He was not satisfied that Richardson "fully intended that the legal title * * * should irrevocably carry with it an unfettered right to enjoy and control". Though, as he said, there was "no direct evidence" of any "specific agreement to reconvey", or even any "specific intent to resume title", Richardson knew "that he could control the treatment and disposition of the property involved as well through his wife as by his direct action", and meant "to exercise that control if and when subsequent events should make such action convenient or advantageous". Since the judge did not make any finding that at the time of the transfer there was any understanding between the spouses

that the wife would deal with any part of the shares as the husband directed, we must dispose of the case on the assumption that there was none, and that the transfers had the usual effect of such documents, except as that was changed by Richardson's full confidence—"knowledge" —that his wife would do with the shares exactly what he asked of her, and by his purpose to exercise his control over them by his hold upon her favor. Arguendo, we accept this finding as justified by the evidence.

 The conclusion drawn from this finding seems to us mistaken, though it does accord with the decision of the majority in White v. Bingham, 1 Cir., 25 F.2d 837. The intent of the donor of a gift, merely as a matter of his mental history, is almost always irrelevant: with few exceptions the law attaches legal consequences to what parties do, quite independently of their private purpose or intent, unless the transaction is not between two separate individuals, but, for example, between one or more shareholders and a corporation of which he or they own all the shares. Commissioner of Int. Rev. v. Dyer, 2 Cir., 74 F.2d 685. It is of course always possible that the parties to a formal transaction, like a deed or a written contract, may agree between themselves that it shall not have the effect upon their rights or obligations which it purports to have, or indeed any effect whatever; that it shall be a sham, a fetch, a disguise. So in this case the transfer may in fact have been intended only to deceive the taxing authorities. It is not necessary that such a mutual understanding shall be explicit or verbal; it may be gathered from the conduct of the parties in a series of transactions, or in any other way. Johnson v. Commissioner, 2 Cir., 86 F.2d 710. All that need appear is that the donor did not intend to divest himself of control over the res, that the donee knew of the donor's intent and assented to it, and that the donor knew of the donee's assent. If all this is fairly inferrable from the relations, the gift, however formal, is a sham; but the donor's belief, though well founded, that he can prevail upon the donee to comply with his demands, is alone not enough; it does not put the donee's will under any constraint, and the property becomes unconditionally his. Marshall v. Commissioner, 6 Cir., 57 F.2d 633; Smith v. Commissioner, 7 Cir., 59 F.2d 533; Kell v.

Commissioner, 5 Cir., 88 F.2d 453; Bardach v. Commissioner, 6 Cir., 90 F.2d 323.

 It follows therefore that the judgment must be reversed, but it does not follow that the plaintiff should have judgment on this record. We do not now decide whether or not the evidence would support a finding that Richardson and his wife mutually understood that the transfer should not give her unfettered dominion over the shares. That will, in part at least, depend upon the appearance of the witnesses themselves, and the court of first instance —judge or jury—must pass upon it. In so doing it will be justified in considering the four transactions we have described, or any others between the parties of the same general kind. A series of formal gifts, always followed by the complete subservience of the donee to the demands of the donor, would in some degree tend to support the conclusion that the two had implicitly agreed that the donee was bound to do what he always had done. We do not say how far these four transactions should lead us along that path; but we are satisfied that they are admissible as evidence bearing upon the mutual intent of the parties in the transfer of July 6, 1931. The case must be tried again, or, if the parties agree, new findings may be made on the same record by the same judge.

Judgment reversed: new trial ordered.