## RICHARDSON v. COMMISSIONER OF INTERNAL REVENUE.

### No. 239.

Circuit Court of Appeals, Second Circuit.

July 9, 1941.

White & Case, of New York City (Charles E. Hughes, Jr., Joseph M. Hartfield, Josiah Willard, and Holt S. McKinney, all of New York City, of counsel), for H. S. Richardson, petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for Commissioner of Internal Revenue, respondent.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by H. S. Richardson from a decision of the Board of Tax Appeals adjudging an income tax deficiency against him of $199,920.36 for the year 1933. Two questions are involved. The first is whether the income for the year 1933 from five trusts created by the taxpayer's wife in May, 1932, is taxable against him. The second is whether cer-

tain profits which he realized from short sales of stock resulted in income taxable to him for the year 1933.

### The Trusts.

In July, 1931, the taxpayer decided to divide his large estate with his wife and to that end assigned to her 57,500 shares of a holding corporation known as Piedmont Financial Company, the value of which was about $4,000,000. He notified her of the gift on July 4, 1931. At that time there was no understanding that he was to have any control over the 57,500 shares of stock.

In March or April, 1932, while the gift tax legislation was pending in Congress, the taxpayer and his wife, who were then domiciled in Connecticut, discussed the desirability of her creating trusts for the benefit of their five children prior to the imposition of gift taxes. They were advised by counsel that if Mrs. Richardson, as grantor of the proposed trusts, retained a power of revocation she would be taxable upon the income, but that if Mr. Richardson should be given such a power neither he nor she would be taxable upon the income. Accordingly five trust instruments were drawn by counsel and executed by Mrs. Richardson, setting up trusts for the five children. The corpus of the trusts for the three sons consisted of 12,500 shares of the Piedmont Financial Company for each and for the two daughters of 2500 for each. The remaining 15,000 of the 57,500 shares which had been given to Mrs. Richardson in 1931 were retained by her. The trusts created were alike except as to the names of the beneficiaries and the number of shares of the stock. Mrs. Richardson was designated as the grantor in each and her husband, H. S. Richardson, was named as the trustee.

The trustee was directed to hold, invest and reinvest the principal, collect the income and, in his discretion, to apply so much income as he deemed advisable to the maintenance, education and benefit of the particular beneficiary until the latter should become 21 years of age and thereafter to pay over so much of the income as he deemed advisable until the beneficiary should become 35 and thereafter to pay the income of the trust to the beneficiary for life.

Each trust was to terminate upon the death of the beneficiary whereupon the principal with any accumulations was to pass to the beneficiary's descendants or, in the event there should be none, to the surviving brothers and sisters and the descendants per stirpes of any of them who should have died without issue.

The trustee was empowered in his absolute discretion to hold and retain any property received by him although not of the character of investments permitted by law to trustees; also to sell or exchange the trust corpus and reinvest the proceeds in any property though not of such character; to expend trust income and proceeds "in payment of premiums for life insurance" upon the lives of the grantor or the taxpayer; to purchase real or personal property from the grantor or the taxpayer and to make secured or unsecured loans to them without liability "in any way for any loss resulting to the trust estate by reason of such purchase or loan." The trust instruments, in addition to other powers of management and investment, likewise provided as follows:

"Eleventh: During his lifetime, H. Smith Richardson, husband of the Grantor, may cancel and terminate this agreement by an instrument in writing duly executed and acknowledged and filed with the Trustee or Trustees then acting, and upon such termination and cancellation the said H. Smith Richardson shall be entitled to receive the corpus of the trust fund absolutely and free from all trusts."

During the year 1933 the taxpayer, as trustee, received $2.85 per share as dividends upon the stock of the Piedmont Financial Company which formed the corpus of the trusts. These dividends were paid in notes of the company aggregating for the five trusts $121,125. No other income was received by the several trusts during that year and the amount that was applicable to each trust was included in income tax returns for 1933 filed by the taxpayer as trustee.

All five trusts have remained unrevoked. The taxpayer never used any of the income for his own benefit but accumulated and invested it, except for certain small distributions made to his two daughters.

The Board of Tax Appeals held that the corpus of each trust was so far subject to the taxpayer's unfettered dominion that it in substance was his and, even though he did not see fit to use it or the income for his personal benefit, the income was taxable to him under the broad provisions of Section 22(a) of the Revenue Act of 1932, 26 U.S. C.A. Int.Rev.Acts, page 487.

The taxpayer insists that the power of revocation, which he never exercised, was not an asset of the taxpayer's estate and gave him no interest in the corpus of the trusts under the law of Connecticut. State ex rel. Beardsley v. London & Lancashire Indemnity Co., 124 Conn. 416, 200 A. 567; McMurtry v. State, 111 Conn. 594, 151 A. 252; cf. United States v. Field, 255 U.S. 257, 41 S.Ct. 256, 65 L.Ed. 617, 18 A.L.R. 1461, and Restatement of Property, § 327. Though we may assume that this is so, the question remains whether an unfettered control over the corpus of a trust either in the grantor or in the donee of a power of revocation, who may appropriate it to his personal use, is not the equivalent of ownership of the property for tax purposes.

The Commissioner relies on Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, where the grantor was taxed on the income of a trust payable to his wife because he was entitled to the reversion after the expiration of a short term trust and, pending its duration, possessed extensive powers of investment and management. The theory was that the trust res essentially remained the property of the grantor and was at all times his for purposes of taxation.

■ The power of revocation which, in the case at bar, was vested in the taxpayer under the five trusts and might at any time be exercised for his own benefit involved still greater control on his part than the powers of reinvestment retained by the grantor in Helvering v. Clifford, supra. Whatever may be the common law rule, which however has been modified by the National Bankruptcy Act § 70, 11 U.S.C.A. § 110, sub. a(3) and by statute in New York and elsewhere (see Restatement of Property § 327 Comment d), so as to subject such a power to the claims of creditors, it is a rule of property that ought not to determine the rights of the donee of the power if there is a clear public interest to the contrary. We cannot suppose that a court which held the income of a trust subject to taxation against the grantor, where there were serious difficulties in reaching such a result, would hesitate to treat the income in a case like the present as that of the donee of the power.

■ Our decision in Richardson v. Smith, 2 Cir., 102 F.2d 697, 125 A.L.R. 774, where there was a gift of stock of the Piedmont Financial Company by the taxpayer's brother to the latter's wife, who, in turn, created trusts in the stock like those in the case at bar, appointed her husband trustee, and gave him identical powers to revoke and vest the stock in himself, was rendered prior to the decision of the Supreme Court in Helvering v. Clifford, supra. Moreover, we did not there consider it necessary to determine the effect of the power. Indeed, we stated in the opinion, at page 698 of 102 F.2d, that the Commissioner had assessed the income against the husband, not because of his power of revocation, but because he had not parted with the shares by the "apparent transfer to his wife", in other words, that he had not made a genuine gift. The trial court seemed to have adopted the view of the Commissioner, but made an inconclusive finding which required clarification in a new trial.

The order of the Board taxing the income of the trusts against the taxpayer is affirmed.

### Short Sales.

■ The taxpayer through his agent, Piedmont Financial Company of New York, which we shall call the Management Company, conducted various short sale transactions in stocks of a company known as Drug, Inc. To effect these sales he borrowed 27,700 shares of stock of Drug, Inc. He sold 34,800 shares of Drug, Inc., to various purchasers during the years 1932 and 1933 and purchased a like amount, of which 7,100 shares were used to make deliveries upon his total sales of 34,800 shares, and the balance was returned to the lenders. These 7,100 shares, at the time of purchase, were intended to cover pro tanto his obligations to return the borrowed stock, and were so entered in account No. 18 kept by the Management Company as a short account. But they were in fact used to make deliveries to persons to whom he later sold stock of Drug, Inc. After these deliveries there was insufficient stock to make good his borrowings and it was necessary to purchase additional stock of Drug, Inc., in order to fulfill his obligations, which was finally accomplished by deliveries during June and July, 1933.

The taxpayer argues that gain or loss was realized when the acts that determined gain or loss had been completed, that this occurred when he bought the 7,100 shares and they were placed in an account with the intention of using them for delivery to the lender. In this connection it should be observed that he followed a consistent practice of matching the first purchases

4

with the first sales. The difficulty with the contention of the taxpayer is that he is not shown to have made and entered in his account No. 18 these alleged covering purchases of 7,100 shares under any agreement or understanding with the lender or to have otherwise placed himself in a position where he was not entitled to treat the shares as long stock and sell them for his own account. As we have already said, he in fact never used these shares to cover his obligations but only to make sales in a market thought to present an opportunity for future purchases at a lower price. We think that his unfulfilled intention to make a covering purchase did not result in a completed transaction on which gain or loss was realized. In our opinion gain or loss was only realized when the borrowed stock was delivered, or at least not before the lender acquired an equitable interest in specific shares.

The definition of a "short sale" made by the Securities Exchange Commission under the authority of the Securities Exchange Act, 15 U.S.C.A. § 77b et seq., warrants the result we have reached. The definition promulgated by the Commission is as follows: "The term 'short sale' means any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." Rule X-3B-3. (CCH. Securities Law Service, par. 22,244).

According to the above definition the 7,100 shares were not short sales which the taxpayer covered by subsequent purchases but were long sales of his own stock. The cost of the subsequent purchases which he used to return borrowed stock had to be matched against the amounts realized for the original short sales of stock in that amount.

The taxpayer says that even if the short sale transactions were closed by the deliveries in June and July, 1933, some of the shares then delivered were purchased in 1932 and the gain or loss qua these shares was fixed when they were purchased, irrespective of the time of delivery. Yet they remained under control of the taxpayer and up to the time of actual delivery could have been sold and replaced by other purchases in the absence of prior agreement with the lender to use them to make restitution. Such a shifting intent to cover a short sale ought not to be the critical event which would determine gain or loss under a

tax statute. It would leave the whole matter of fixing the event to the taxpayer's own will. We hold that the time of delivery was the time at which the covering transactions must be regarded as closed.

Such decisions as Ruml v. Commissioner, 2 Cir., 83 F.2d 257, and Commissioner v. Dashiell, 7 Cir., 100 F.2d 625, are not adverse to our conclusion. In each case stock belonging to the seller, but inaccessible at the time of sale, was not turned over to his broker until the next year after the sale. In the meantime the broker had loaned stock to that amount to carry out the selling orders. Because the seller's own stock was inaccessible, he had to borrow, but he had agreed with his broker to use his own stock as soon as he could to cover the transaction. In other words, the seller's shares at the time the stock was loaned by the broker belonged in equity to the latter and no delivery was required to fix the gain or loss on the transaction.

 A majority of the Board held that the gain or loss incurred through the short sales was determined by what the taxpayer paid for the shares actually delivered, and that there was no gain or loss until 1933 when the shares were actually returned. We think that the Board was right in computing the tax upon this basis.

Order affirmed.