RICHARDSON v. COMMISSIONER OF INTERNAL REVENUE (two cases).

COMMISSIONER OF INTERNAL REVENUE v. RICHARDSON (two cases).

Nos. 183, 184.

Circuit Court of Appeals, Second Circuit.

Feb. 27, 1942.

Supplemental Opinion March 20, 1942.

Carter, Ledyard & Milburn, of New York City (Leslie D. Dawson and Allin H. Pierce, both of New York City, of counsel), for taxpayers.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Newton K. Fox, Sp. Assts. to the Atty. Gen., for Commissioner.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

These cases are companions and were argued together. The evidence in the case of H. Smith Richardson and in that of Lunsford Richardson was substantially the same. We shall, for convenience, consider them together.[1]

Early in 1932, Lunsford Richardson and his brother, H. Smith Richardson, were the owners of many shares of Vick Finan-

---

[1] Our narrative of the evidence will indicate the relevant differences.

cial Company, a Delaware Corporation.[2] They were also the owners of all the shares, and were respectively president and vice-president, of Piedmont Financial Company (a New York Corporation with its offices in New York), which handled matters for them on their instructions.

H. Smith Richardson owned 98,758 shares of Vick Financial, evidenced by certificates in his name which were unendorsed and kept in his safe deposit box in Greensboro, North Carolina. Lunsford Richardson owned 53,599 shares of Vick Financial, evidenced by unendorsed certificates in his name and kept in his separate safe deposit box in Greensboro. The box of H. Smith was accessible only to himself or to his brother if accompanied by George Dawson (who was also secretary-treasurer of Piedmont), or by Pearle Hubbard (who was an employee of Vick Chemical Company). The box of Lunsford was accessible only to Lunsford or to H. Smith if accompanied by Dawson or Pearle Hubbard.

As to 48,780 additional shares of Vick Financial owned by H. Smith Richardson, and 2,100 additional shares of that company owned by Lunsford, the following steps had been taken in 1931: The certificates for those shares had been delivered to Bankers Trust Company of New York as "depositary." The bank had caused those certificates to be registered in the names of its nominees,[3] and kept the certificates in its possession, in certain so-called "accounts," one for Lunsford and one for H. Smith. The bank was directed to deliver stock out of these accounts on written instructions from Piedmont. The relation of the Richardsons and Piedmont to Bankers Trust as "depositary" appears principally in the following exhibit, a certified copy of a corporate resolution of Piedmont:

" 'Whereas, this Company has designated Bankers Trust Company of No. 16 Wall Street, New York City, as depositary of this Company for the deposit of stocks, bonds or other securities held by this Company,

" 'and said Bankers Trust Company has been *designated by* certain other corporations and persons (including J. H. S. Richardson,[4] Lunsford Richardson, Jr., and Mary Lynn Richardson, deceased, as trustees under the last Will and Testament of Lunsford Richardson, deceased) *as depositary for the deposit of stocks,* bonds or other securities *held by them, individually* or as trustees,

" 'and said corporations and persons have authorized this Company to act on their behalf in the management and administration of such investment accounts; and

" 'Whereas, said accounts with Bankers Trust Company for our convenience have been briefly designated as follows:

> "Piedmont Account No. 1
> "Piedmont Account No. 2
> "Piedmont Account No. 3
> "Piedmont Account No. 4
> "Piedmont Account No. 5
> "Piedmont Account No. 7
> "Piedmont Account No. 9
> "Piedmont Account No. 11
> "Piedmont Account No. 13
> "Piedmont Account No. 14

"and additional accounts may be opened with Bankers Trust Company by other corporations and/or persons on whose behalf this Company may act in the management and administration of their investment account under similar conditions.

" 'Resolved, that Bankers Trust Company, as such depositary, be and hereby is authorized and directed

" '(a) To sell and exchange and/or purchase any and all stocks, bonds or other securities in or for the above mentioned account, or any of them, or in or for any additional account which may be opened by this company with Bankers Trust Company for other corporations and persons under similar conditions, as above recited, and/or

" '(b) To receive for deposit, hold and deliver stocks, bonds or other securities in or for the above mentioned accounts, or any of them, or additional accounts which may be opened by this Company under similar conditions, as aforesaid,

" 'on the written instructions of this Company, which instructions shall be signed by either its President or its Vice-President or its Second Vice-President or its Secretary-Treasurer or its Assistant Secretary-Assistant-Treasurer, except in the case of stocks, bonds or other securities

---

[2] We note, for what it is worth, that Delaware has not enacted the Uniform Stock Transfer Act.

[3] Although the record is silent on the point, we assume that the nominees had endorsed the certificates in blank.

[4] The evidence shows that this was another name used by H. Smith Richardson.

to be delivered out of said accounts, or any of them, against receipt, in which case said written instructions must be signed by any two of said officers, and said officers are hereby authorized and empowered accordingly, and that the Secretary-Treasurer is hereby directed to certify to said depositary the respective names of said officers of this Company with specimens of their signatures for use by said depositary for purposes of comparison.'

"I, G. R. Dawson, Secretary-Treasurer of Piedmont Financial Company, Inc., do hereby certify that the foregoing is a true copy of resolutions duly adopted by the Board of Directors of said Company at a meeting duly held, a quorum being present, on the 2nd day of February, 1931, and that such resolutions are now in full force and effect; and I further certify that the following persons are officers of this Company in the capacities set opposite their respective names and that the signatures set opposite such names are their respective signatures:

| "Name | Officer | Signatures |
| --- | --- | --- |
| "J. H. S. Richardson | President | J H S Richardson |
| "L. Richardson | Vice-President | L Richardson |
| "W. Y. Preyer | 2d Vice-President | W. Y. Preyer |
| "G. R. Dawson | Secretary-Treasurer | G. R. Dawson |
| "Calvin Wylie | Assistant-Treasurer-Assistant Secretary | Calvin Wylie |

"Witness my hand and the seal of said Company this 13th day of February, 1931.
"G. R. Dawson,
"Secretary."

The evidence shows that, as Bankers Trust knew, "Piedmont Account No. 2" consisted of certificates for the 48,780 shares belonging to H. Smith Richardson, and "Piedmont Account No. 3" consisted of certificates for the 2,100 shares belonging to Lunsford. The resolution shows that the bank was authorized to rely on written instructions from Piedmont as to the disposition of the certificates. There is no evidence, however, that Piedmont could give any such instructions without, in each instance, receiving specific authority to do so from H. Smith as to his certificates or from Lunsford as to his. On the contrary, the evidence is that Piedmont was, as to the Richardson brothers, merely "their financial advisor and agent."

Pearle Hubbard, who lived in Greensboro, kept there a set of records showing the various securities owned by Lunsford and those owned by his wife. Similar records were kept by Piedmont in New York as to Lunsford and his wife and also as to H. Smith and his wife. Piedmont also kept records of the income and disbursements of, and prepared the income tax returns for, Mrs. Margaret B. Richardson, wife of Lunsford, and Mrs. Grace Jones Richardson, wife of H. Smith, and acted generally for them in divers financial matters.

In the Spring of 1932, the Richardson brothers learned that Congress might soon enact a statute taxing gifts. They conferred with one another as to the advisability of each making a gift to his own wife prior to any such enactment. Because of some differences, we shall recite separately the pertinent acts of the two brothers:

Lunsford Richardson, on May 18, 1932, was in Greensboro, where he lived. On that day, he told Pearle Hubbard that he was making a gift to his wife of all his Vick Financial stock, and directed her to make, and she then did make, notations to that effect on the cards she kept. He at once reported to his wife what he had done, and she told him she accepted the gift. But he did not then go to his box in Greensboro or then in any other way attempt to make physical delivery of the certificates to his wife or to cause them to be transferred to her name on the books of Vick Financial.

Nine days later, on May 27, 1932, while he was in New York, he told the officers of Piedmont that he had given his Vick Financial stock to his wife, and asked Dawson to prepare whatever papers were necessary to have it transferred of record to his wife's name. Accordingly, Dawson at once prepared, and Lunsford then executed, assignments in blank transferring to his wife his shares in Vick Financial, it being understood that these assignments related to the certificates standing in Lunsford's name and which were in his Greensboro box. These assignments were forthwith delivered to Dawson, but Lunsford told him "to hold" them until he returned to Greensboro and had forwarded to Dawson the certificates in the safe deposit box,

whereupon Dawson "should have the stock * * * transferred to the name of Mrs. Richardson."

Dawson told him that it would not be necessary for him to execute any assignment as to the 2,100 shares held by the Bankers Trust as "depositary," because this stock was held in the name of the bank's nominees and no transfer of record ownership was necessary, but that he, Dawson, as an officer of Piedmont, could have this stock removed from Lunsford's account at the bank and placed in his wife's account. Lunsford asked Dawson to have this change made when the certificates still in his safe deposit box at Greensboro were received by Dawson. No further acts occurred prior to the enactment on June 6, 1932, of the gift tax provisions of the Revenue Act of 1932.

Thereafter, on June 9th, 1932, after the enactment of that statute, Lunsford returned to Greensboro, removed the certificates from his box and mailed them to Dawson. On June 20, 1932, Dawson delivered these certificates and the written assignments to Vick Financial's transfer agent, for transfer to Lunsford's wife.

On June 25, 1932, Dawson, as officer of Piedmont, instructed Bankers Trust in writing "to withdraw from the custodian account (Piedmont Account No. 3) 2,100 shares of Vick Financial Corporation stock * * * and deliver this stock against receipt to Mrs. Margaret B. Richardson (Piedmont Account No. 12) * * *". These instructions were obeyed.

We now turn to the acts of H. Smith Richardson: On May 27, 1932, while in New York, he told Dawson that he had decided to give all except 404 shares of his Vick Financial stock to his wife, Grace Jones Richardson, and asked Dawson to prepare whatever papers were necessary. Dawson told him it would not be necessary to execute any assignment of the 48,780 shares in the custodian account with Bankers Trust, because no transfer of record ownership of this stock would have to be made as it was registered in the name of the bank's nominees and "represented merely a credit to that account." [5] H. Smith in-

structed Dawson to make entries on Piedmont's cards to show that those shares belonged to his wife. Dawson then made the notations as instructed.

As to the shares in H. Smith's box at Greensboro, Dawson at once prepared and H. Smith then executed, and delivered to Dawson, assignments in blank which were intended to cover the 98,758 shares.[6] Notations were then made on Piedmont's cards, with the approval of H. Smith, indicating the gift of such shares. Dawson at the same time asked Lunsford, then in New York, upon his return to Greensboro, to obtain the certificates in the box of H. Smith in Greensboro and mail them to Dawson so that he could have them transferred on the books of Vick Financial. That evening H. Smith told his wife that he had made her such a gift; she thanked him and asked that he have Dawson handle it for her; this request was transmitted a few days later to Dawson. No further acts occurred until after the enactment of the gift tax provisions.

After that enactment, on June 9, 1932, Lunsford, as already noted, returned to Greensboro. He then, in company with Pearle Hubbard, opened the box of H. Smith, extracted the certificates and mailed them to Dawson. On June 20, 1932, Dawson delivered these certificates and the written assignments to the transfer agent for transfer to the wife of H. Smith.

On June 23, 1932, Dawson, as officer of Piedmont, instructed Bankers Trust in writing "to withdraw from the custodian account of H. S. Richardson, Piedmont Account No. 2 48,780 shares * * * and deliver against receipt to a new Piedmont Custodian Account in the name of Mrs. Grace Jones Richardson, which new account is to be Piedmont Account No. 22." These instructions were obeyed.

1. The Board held that the taxpayers did not, before the date of the enactment of the gift tax provisions, make completed gifts of the stock represented by certificates in their respective safe deposit boxes in Greensboro. From these adverse decisions, the taxpayers have appealed.

---

[5] H. Smith Richardson, unlike Lunsford, apparently did not expressly direct Dawson to have the stock removed from his account at the bank and placed in his wife's account.

It should be noted that Lunsford, unlike his brother, was at the hearing in 1938. confronted by an affidavit (attached to a 1932 gift tax return) which he had executed 1935.

[6] 404 additional shares, which had been received by H. Smith as a stock dividend, were not included in the gift.

A completed gift involves two major ingredients: (a) an intention to make a gift, and (b) certain ritualistic or ceremonial conduct involving relinquishment by the donor of what is called "dominion" or "control." Neither ingredient alone will suffice. Each is a necessary, but neither, alone, is a sufficient condition. They are sometimes difficult to keep separate, for the same evidence may bear on both. The requirement of an intent to give is, of course, beyond criticism. The ceremonial requirement has, however, been criticized. It is, to be sure, a survival from an older period whose perspective was far different from ours.[7] But, if not carried to excess, that ritualism has still some value, serving to show that the donor knows he is engaging in an act which will be taken seriously;[8] it is thus something of a preventive of fraud.

Considering what Paul has called the "bed chamber" aspect of purported gifts between husband and wife, in the light of the artificiality of the tax law provisions—which, in spite of the obvious two-in-one character of the marriage status, allow each spouse to be a separate taxpayer—it would be arguable (and the Commissioner so intimates) that in the case at bar there was no intention to make gifts.[9] But we are spared the difficult job of dissecting the record with those none-too-sharp implements "intent," "motive," and "purpose," since the Board has made findings that the intention existed, and on that issue there is enough evidence to sustain its findings.

We come then to the question of the adequacy of the ceremonial acts, considered apart from the matter of intention. In searching for the correct legal rule to be used in reaching our answer, we are not here compelled by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to play the rule of ventriloquist's dummy to the courts of some particular state; as we understand it, "federal law," not "local law," is applicable.[9a] See Morgan v. Commissioner, 309 U.S. 78, 80, 81, 626, 60 S.Ct. 424, 84 L.Ed. 585, 1035, and the views of our leading tax commentator, 2 Paul, Federal Estate and Gift Taxes (1942) 1071–1078; cf. concurring opinion of Frankfurter, J., in United States v. Pink, February 2, 1942, 62 S.Ct. 552, 86 L.Ed. ——. We are free, therefore, not to insist on too much ritualism.[10] But, under all the authorities, there must be some.

There was here, prior to the enactment of the gift tax provisions, no physical delivery of the certificates to the donees nor any attempt to transfer them to their names on the books of Vicks Financial. We assume, arguendo, that the assignments in blank would have been adequate ceremonial gift conduct, if the assignments had been delivered to the respective donees or to their agent. Admittedly there was no such delivery to the donees. And the Board has found that, in connection with these transactions, Dawson —whether regarded as an individual or as representing Piedmont—was the agent of the donors, not of either of the donees.[11] The evidence on that point is equivocal; it is enough so that, having in mind the taxpayers' burden, we cannot hold that there is not ample evidence to sustain the Board's findings. And those findings likewise dispose of the entries on Piedmont's records, even assuming that those entries constituted a sufficient ritual (which they did not), since the Board found that Piedmont was not the agent, in these transactions, of either donee. Accordingly, we must affirm on the taxpayers' appeals.

2. The Board decided that, prior to the enactment of the statute, effective gifts had been made by each of the brothers of the stock held by Bankers Trust as depositary. From the Board's orders as to these matters, the Commissioner has appealed.

The Board differentiates these

---

[7] Cf. United States v. Forness, 2 Cir., 1942, 125 F.2d 928, 934.

[8] For similar comments as to consideration in the "law of contracts," see Havighurst, Consideration, Ethics and Administration, 42 Col.L.Rev.(1942) 1.

[9] Paul, Studies in Federal Taxation (1937) 150–153; Paul, 2 Federal Estate and Gift Taxation (1942) 1071; cf. Burnet v. Wells, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439; Richardson v. Smith, 2 Cir., 1939, 102 F.2d 697, 698, 699, 125 A.L.R. 774; Richardson v. Commissioner, 2 Cir., 1941, 121 F.2d 1, 3.

[9a] Cf. Russell v. Todd, 309 U.S. 280, 287, 294, 60 S.Ct. 527, 84 L.Ed. 754.

[10] Cf. United States v. Forness, supra.

[11] That is to say the Board found that neither Dawson nor Piedmont was the agent of the donees in receiving the assignments.

transactions from those relating to the certificates in the safe deposit boxes in Greensboro. The gifts of the latter were incomplete, the Board said, because Dawson and Piedmont were, as to those certificates, merely agents of the donors. On the basis of the findings, that decision was correct. But the Board held that, as to the "depositary" certificates, Piedmont was something more—it was a "corporate bailee." That differentiation, if founded in fact, would be valid: While instructions given or delivery made to a donor's agent will not complete a gift, yet instructions to a donor's bailee, in possession of stock certificates, to hold them for a donee, do constitute, as the Board said, a closed gift. Some authorities seem to require that the bailee accept the instructions before the gift is executed, but instructions given to the bailee, in such a case as this, are, in any event, an indispensable minimum. We can discover no authorities holding otherwise.

It is crucial, then, whether the evidence shows that Piedmont, in May 1932, was the donors' bailee. The Board, regarding it as bailee, concluded that the gifts of the shares represented by the certificates lodged with the Bankers Trust as depositary were complete when the donors, on May 27, 1932, told Dawson, as an officer of Piedmont, to make the notations on Piedmont's records (as he did) and, at the same time, directed Dawson to instruct Bankers Trust Company to hold those shares for the donees. The statement then made by Dawson that it was unnecessary to execute any assignments of such stock is, the Board says, "tantamount to an unequivocal acknowledgment by Piedmont that the stock thenceforth was being held by it as the agent" of the donees. In support of this finding, the Board finds, as already noted, that Piedmont was "the corporate bailee" and that "Piedmont had designated Bankers Trust Company as its depositary for the deposit of stocks * * * which it (Piedmont) was holding for the Richardsons."

The evidence does not sustain those findings. It is plain that the bank, not Piedmont, was in physical possession of the certificates. The Board's finding perhaps implies that the Richardsons had delivered these certificates to Piedmont which, in turn, had, with the approval of the Richardson brothers, deposited them with the bank. Whether, if that were true in fact, Pied-mont would be a bailee, with the bank as a sort of sub-bailee, we gravely doubt. But the record does not show that the certificates were delivered to Piedmont to hold for the Richardsons and that Piedmont then turned them over to the bank to hold for it. The evidence on the subject is found in the exhibit quoted above. It shows that Piedmont delivered to the bank certain securities "held by" it, Piedmont. But it also indicates that the bank had been designated by the Richardsons "as depositary for the deposit of the stocks * * * held by them individually." Among the stocks deposited with the bank were the shares of Vick Financial owned by the Richardsons. They were held by the bank in Piedmont Account Nos. 2 and 3, respectively, as the bank knew. On the basis of this evidence, therefore, it would seem clear that the certificates had been deposited by the Richardsons with the bank. In any event, as the disposition of the certificates held by the bank was in the Richardsons, the bank was acting as bailee of those certificates for the Richardsons. The bank, to be sure, was told by the bailors, the Richardsons, that instructions as to the disposition of those stocks would come from Piedmont; so far as the bailee bank was concerned, it was thus authorized to rely on Piedmont's word. But Piedmont had no general authority from the Richardsons to give any instructions to the bailee bank. Piedmont was, as to the certificates held by the bank, merely agent for the Richardsons. No instruction from Piedmont to the bank would have been lawful, in any instance, unless specifically authorized by H. Smith as to his certificates, or by Lunsford as to his.

It follows, then, that on May 27, 1932, the bank, not Piedmont, was holding that stock for H. Smith and Lunsford Richardson. It continued to do so until after the date when the gift tax provisions went into effect. The bank was the bailee; Piedmont was not so, in any sense of the word. The fact that the bank, the bailee, had been told by the Richardsons to act on the written instructions of Piedmont, did not make Piedmont a bailee; it did not put the certificates in the possession of Piedmont. Nor, as between the Richardson brothers and Piedmont, did it give Piedmont control of the certificates; that control was reserved by the Richardsons. It is irrelevant that, if Piedmont had unlawfully (i. e., without specific authority) given instruc-

tions to the bank, the bank would have been protected in relying on them. As Piedmont, then, was merely the agent of the donors, and not their bailee, entries on its records did not suffice to complete the gifts. At a minimum, instructions given, on behalf of the donors, to the bailee to attorn to the donees were essential. What the donors told their agent, Piedmont, could not do the trick. We may disregard the fact that the Richardsons might be said to control Piedmont because they owned all its stock. But we cannot ignore the fact that it was only their agent for carrying their instructions to the bailee. Consequently, when Lunsford told Piedmont to instruct that bailee to attorn to his wife, he was talking merely to his own servant. (No express directions to the same effect appear to have been given by H. Smith Richardson to Piedmont but, taking the case most favorably to him, we may assume that such directions were implied in his conversation with Dawson.) Those talks between the brothers Richardson and Piedmont were, in effect, soliloquies; they were, in and of themselves, no more effective, for the purpose of concluding the gifts, than would have been conversations with any third persons. They were evidence of intention to make the gifts, but did not effectuate them. The directions to transmit the instructions to the bank were like an unmailed letter of instructions to a bailee. Until, in the latter part of June, 1939, the bailee bank received the instructions transmitted through the donor's agent, Piedmont, the gifts were incomplete, not binding on the donors. At any time before Piedmont communicated with the bank, the donors could have revoked the directions to Piedmont, their agent, to instruct the bank, the bailee, to attorn to the donees. As the bank received no such instructions until after the gift tax went into effect, the gifts were properly taxable.

■ Accordingly, we reverse the Board's orders on the appeals of the Commissioner. But the contention that the bank, and not Piedmont, was the bailee was not urged by the Commissioner. Fairness to the taxpayers seems to us to require that the case be remanded for the limited purpose of considering evidence, if any, which may be offered, tending to show that Piedmont had such independent control of the certificates held by the bank that the orders given by the donors to Piedmont were orders given not merely to their agent, but

to a bailee. We remand for that limited purpose.

The orders of the Board on the appeals of the taxpayers are sustained. The orders of the Board on the appeals of the Commissioner are reversed and remanded for proceedings in accordance with this opinion.

### Supplemental Opinion.

■ Our attention has been called to the fact that, inadvertently, we failed to dispose in our opinion in this case of the Commissioner's contention that the petitioner, Lunsford Richardson, should not have been allowed to use the $50,000.00 specific exemption in 1932. Thinking that he was not liable for a gift tax in 1932, he did not claim the benefit in that year of the $50,000.00 specific exemption allowed by § 505(a) (1) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 586. In 1934, reporting substantial gifts, he took the full amount of that exemption. The Board, having found the 1932 gift to his wife to be taxable, held that he might claim his exemption in that year, and, upon an amended answer by the Commissioner, sustained a deficiency for 1934 to counterbalance the shifting of the exemption from that year back to 1932. The Board's action was correct. If the taxpayer had claimed the $50,000.00 exemption in 1934 in ignorance of the facts which created liability for a 1932 gift tax, he would be permitted, upon discovery of the material facts, to recompute his 1932 and 1934 returns so as to claim his exemption in the earlier year. See Lucas v. Sterling Oil & Gas Co., 6 Cir., 62 F.2d 951; Glenn v. Oertel Co., 6 Cir., 97 F.2d 495; cf. Morrow, Becker & Ewing, Inc. v. Commissioner, 5 Cir., 57 F.2d 1. Cf. also Pictorial Review Co. v. Helvering, 63 App.D.C. 21, 68 F.2d 766; Momsen-Dunnegan-Ryan Co. v. Helvering, 63 App.D.C. 9, 68 F.2d 754, 755; Patent Royalties Corp. v. Commissioner, 2 Cir., 65 F.2d 580. We see no reason why ignorance of the law is not equally a bar to an intelligent "election," and why the taxpayer should be held to a choice made under a misapprehension of his legal liability. There are cases squinting in this direction. C. H. Mead Coal Co. v. Commissioner, 4 Cir., 106 F.2d 388 (bad advice, but error corrected before subsequent return filed); Momsen-Dunnegan-Ryan case, supra (dictum, as to ignorance of a new regulation); Patent Royalties Corp. case, supra (but here there was a deliberate attempt to

claim the choice subsequently asked).[12] None of these cases goes as far with respect to a mistake of "law" as does the Lucas case with respect to a mistake of fact. But the power of a taxpayer to take advantage of a favorable provision by amending his returns should not be confined to instances where the taxpayer has made a mistake of fact. Mistakes of "law," at least if they are honest, are no less excusable. In holding that a recomputation is equitable here, we are moved by the facts that (1) Lunsford's mistake was an honest error in computing his tax liability, and not merely an error in judging whether it would be more advantageous to claim the exemption in a later year, (2) it appears quite likely that he would have taken the exemption in 1932 if he had not been mistaken as to his liability then, and (3) it is possible to recompute and to reassess the deficiency resulting in 1934 from his shift in position. For these reasons, we sustain the Board's decision on this issue.

---

[12] But see Radiant Glass Co. v. Burnet, 60 App.D.C. 351, 54 F.2d 718.